**Pages 1 - 23**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| SETH LONG, individually, and on behalf of other members of the general public similarly situated,<br><br>          Plaintiff,<br><br>   VS.<br><br>GRACO CHILDREN'S PRODUCTS INC., a Delaware corporation; NEWELL RUBBERMAID INC., a Delaware corporation,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **NO. C 13-01257 JD**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

San Francisco, California
Wednesday, October 1, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiff Seth Long:
                    Capstone Law APC
                    1840 Century Park East, Suite 450
                    Los Angeles, CA  90067
                    (310) 556-4811
                    (310) 943-0396 (fax)
                    **ROBERT K. FRIEDL**

For Defendant Graco Children's Products, Inc.:
                    Schiff Hardin LLP
                    233 South Wacker Drive, Suite 6600
                    Chicago, IL  60606
                    (312) 258-5524
                    (312) 258-5600 (fax)
              **BY:  JOSEPH J. KRASOVEC**


Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1  **Wednesday - October 1, 2014**                    **10:01 a.m.**

2                    **P R O C E E D I N G S**

3      **THE CLERK:**  Calling Civil 13-1257, Long versus Graco

4  Children's Products, Inc.  Counsel, please state your

5  appearances for the Court.

6      **MR. FRIEDL:**  Good morning, Your Honor.

7  Robert Friedl, for the Plaintiff Long.

8      **MR. KRASOVEC:**  Good morning, Your Honor.

9  Joe Krasovec, on behalf of Graco Children's Products.

10      **THE COURT:**  All right.  I have a number of questions.

11  I'm going to address to both sides.  I'm going to start with

12  Graco.  Is it Graco or Graco?

13      **MR. KRASOVEC:**  Graco.

14      **THE COURT:**  Graco.  Okay.

15     I am not following the proposition in your briefs that a

16  full refund was offered to people in the recall process or at

17  some other point by Graco.

18      **MR. KRASOVEC:**  Yes.

19      **THE COURT:**  I have looked at the notices of the

20  recall that were sent to the public.  Not one of those mentions

21  anything about getting a full refund.  So I want you to tell me

22  what I missed.  Which notice involved that says a full refund

23  will be available?

24      **MR. KRASOVEC:**  Your Honor, that is encompassed in the

25  language, which, by the way, NHTSA approves, and dictates, if

1   you look at the important safety recall -- we attach it as

2   Exhibit 3 to Mr. Galampos' affidavit that we filed on July 30.

3   2014, in which it is indicated that if an individual has

4   incurred costs associated with repairing or replacing the

5   buckles before having received its notice, they can call Graco

6   for further relief.

7           THE COURT:  That's not what I'm asking about.  Where

8   does it say you can get a full refund for your purchase price?

9           MR. KRASOVEC:  It does not state the words "full

10  refund," Your Honor.

11          THE COURT:  Where is the concept of a full refund?

12  Where is the concept of a full refund?

13          MR. KRASOVEC:  The concept of a full refund is

14  embodied in the provision that I just read.

15      In other words, what a consumer does when a consumer has

16  one of these seats and they call Graco -- they are offered a

17  buckle.  If the consumer does not want a buckle, the

18  consumer -- the customer representative works with the consumer

19  to provide a different solution.  If ultimately that solution

20  is a full refund, then that's what Graco gives.

21      But Your Honor, in this case the claims that are being

22  sought, the damages that are being sought, do not award a full

23  refund.  Graco has done that as a matter of customer service to

24  its customers.

25          THE COURT:  I have a problem with that.  I do not see

1   any evidence in here that backs up Graco's statement and your

2   statement in the briefs that people are entitled to a full

3   refund.  Okay?

4        Saying that you can call a customer-service person and

5   wrangle and wrangle and wrangle with them, and then maybe --

6   maybe -- at the end of that you get your purchase price back,

7   is not the offer of a full refund.  That's the offer of last

8   resort by Graco that isn't even mentioned in any of the public

9   documents.  Where does it say in any of these recall notices

10  that the public received, you can ask for a full refund?  It --

11  plain and simple -- doesn't say it anywhere.

12       **MR. KRASOVEC:**  It does not say that you can ask for a

13  full refund, but a full refund is given if that's what the

14  customer wants.

15       **THE COURT:**  The problem is all of these cases.  This

16  is a complicated issue, this issue.  And none of the cases that

17  you tendered fit the situation that you have.

18       Graco did not offer a refund in the recall papers.  It did

19  not offer refund on the website.  There's no evidence that

20  Graco said you can come in and get your purchase price

21  refunded.

22       Now, maybe there was an internal, secret plan that said,

23  you know, if you get a difficult customer, that the

24  customer-service rep has an option to give a refund.  That's

25  not offering a full refund to customers.

1          But the case law that has found prudential mootness to be

2     applicable and mootness generally to be applicable has found in

3     that baby-formula case, the company stepped up and gave

4     everybody a full cash refund right off the bat.  There was no

5     mystery.  There was no discretion.  There was no -- it was an

6     automatic:  You get your purchase price back.  In that

7     situation, the Court found that the relief requested in the

8     Complaint, which was getting money back, was the same as the

9     recall.  That makes some sense.

10         Your situation isn't that.  You want to stop this case

11    now, based on the grounds there's been a recall; but the remedy

12    that you all are offering in the recall doesn't come close to

13    what the plaintiffs are asking for in terms of damages.

14         **MR. KRASOVEC:**  Well, Your Honor, first of all, the

15    cases that we rely on -- the *Winkler* [sic] case, which is the

16    *Toyota* case; the *Cheng* case against BMW -- those are all cases

17    involving a NHTSA-governed recall.  And that's what we have

18    here.

19         **THE COURT:**  No.  *Winzler* -- is that the one you're

20    referring to?  *Winzler?*  *Winzler* involved injunctive relief.

21    Okay?  There was no claim for damages.  So the plaintiff in

22    that case -- first of all, I find *Winzler* to be quite opaque.

23    The Tenth Circuit Decision is hard to understand.  Almost no

24    facts, but the few facts that it offers makes it clear that the

25    plaintiff was asked for injunctive relief.  And the

1  Tenth Circuit says recall is going to provide the effective

2  equivalent of injunctive relief.

3      The other case that came up*, the Cheng* case -- *Cheng v.*

4  *BMW* -- is the same thing.  There were no damages requested in

5  *Cheng*.  So the Court said, *You know what?  You've asked for*

6  *exactly the remedy of repair or replace that the recall is*

7  *going to do*.  And Mr. Cheng did not offer damages.  The case

8  turned on that.

9      The Judge said -- Judge Feess said, you know, Plaintiff

10 insists this case was distinguishable from *Winzler*, because the

11 proposed class seeks not only injunctive relief, but money

12 damages.  And then the Court found -- you know what?  You

13 expressly renounced monetary damages in your Complaint.

14     So you're just like *Winzler*, in the sense that you asked

15 for repair or replace, which is effectively injunctive relief.

16 The recall's going to do it.  And you're done.

17     These folks here have said, *No*.  *We want our money back*.

18 And I don't see a single case that you all have tendered saying

19 in that situation, the recall makes the process moot.  It makes

20 the claim moot.

21     **MR. KRASOVEC:**  I do believe I understand Your Honor's

22 reading of those cases.

23     The *Hadley versus Chrysler Group* in the Eastern District

24 of Michigan did involve also the cost to repair the particular

25 defect in the Jeeps at issue there.  And again, that comes back

1  to what NHTSA requires in a Section 573 recall.

2     **THE COURT:**  Yeah, but you're missing my point.  They

3  want their money back.  They don't want the cost of repair.

4  They don't want another buckle.  They want their money back.

5  They bought a seat that they're unhappy with.  Their theory was

6  they were fraudulently misled in the buying, and they want

7  their purchase price back.

8    All of these cases about, *We'll give you 10 bucks to fix*

9  *the ignition switch, because that's your cost for repair* --

10  they're not controlling.  The controlling case would be a

11  defendant has offered a full refund.  And the plaintiffs come

12  in and say, *Well, we're going to sue for a full refund*.  And

13  then the Court says, *Your requested judicial relief is*

14  *identical to the proposed recall relief, so you're not going to*

15  *be able to go forward*.

16    In all of the cases that you all have cited there has been

17  a delta between what the plaintiff in court is asking for, and

18  what the recall will actually provide.  So I see that delta

19  here.  There is a big gap between what you all in Graco have

20  offered the class or a group of people who were victims, and

21  what the plaintiffs want.  Now, whether they get it or not, I

22  don't know.

23    All we're talking about here is:  Do they have the right

24  to be in front of this Court?  That's all we're talking about.

25    Now, you may prevail in the end.  Who knows?  But I am not

1 persuaded that the Court has all its doors closed because the

2 recall is the be-all and end-all for their remedies.  I don't

3 think you've carried your burden on that.

4          MR. KRASOVEC:  Well, Your Honor, the analysis then

5 goes back to -- there may be what the plaintiff wants, if the

6 plaintiff wants a full refund.  Under none of the causes of

7 action that are left in this case -- there is no longer a fraud

8 cause of action in this case.

9          THE COURT:  There were restitution claims.

10         MR. KRASOVEC:  Those were all -- a restitution claim,

11 which means that they are entitled to the value -- the

12 difference between the value of what they got, and the value of

13 what was promised to them.  And there's no allegation in this

14 case, Your Honor, that there's anything wrong with these car

15 seats, other than the buckle.  And, in fact, the plaintiffs, in

16 their own interrogatory responses, admit that they used both of

17 the seats that are -- that were the subject of this case

18 continuously for their ordinary and intended benefit.  So they

19 clearly got some benefit from the use of the seat.

20    In fact, in one of the -- for one of the seats, they were

21 actually in an accident.  They experienced an accident.  The

22 child, fortunately, was fine.  And there was no allegation that

23 there was any issue with respect to the buckle -- getting it

24 undone, in order to extricate the child.  So they've used the

25 seat.  They are not entitled to a full refund.

1          Under none of these causes of action, if you look at page

2     3 of our reply --

3          **THE COURT:**  They're entitled to more than what Graco

4     offered them.  I'm not going to rule on damages.  Whatever

5     they've asked for, whatever they're entitled to, even if it's

6     less than a hundred percent, even if it's 70 percent, it's

7     significantly more than getting a buckle back from Graco under

8     the recall, and then maybe a couple of bucks to repair or

9     replace it.  The delta exists.  And you can't -- you haven't

10    shown me that the recall is going to give these folks on the

11    plaintiffs' side a fair shake on their claim.  And that's

12    basically what we're talking about here.

13         Now, whether they end up getting what they want -- I don't

14    know.  That's not the issue for today.

15         **MR. KRASOVEC:**  I don't know.  If I can indulge the

16    Court --

17         **THE COURT:**  Of course.

18         **MR. KRASOVEC:**  -- if we think about who are the

19    plaintiffs then in this case, if anybody who has gotten a

20    buckle -- has received a replacement buckle -- they are now

21    excluded from the class.

22         What the plaintiffs are now trying to do is carve out a

23    group of people who either they say their children have

24    outgrown the seat, so they no longer need the seat, but they

25    still have it; or people who, I guess, threw away their seat

1  and bought a Replacement Seat.  Under the recall, both of those

2  individuals are made whole.  The person who still has --

3          **THE COURT:**  How had are they made whole?

4          **MR. KRASOVEC:**  Because the person who still has his

5  seat can get a buckle.

6          **THE COURT:**  No.  A person who saw press stories or

7  they saw blogs or whatever indicating that there are safety

8  concerns, and they say, *I'm not putting my kid in this Graco*

9  *seat.  Go throw it out* -- how are they made whole from what you

10 just said?  There's no buckle to replace.

11         **MR. KRASOVEC:**  Because, under the language I just

12 read to the Court, they can call Graco and get the cost of what

13 they spent to replace the buckle, which was the

14 Replacement Seat.

15         **THE COURT:**  I don't see any evidence that Graco had a

16 publicly announced policy that all you had to do was call up

17 and get a refund of your purchase price.  So nowhere does it

18 show me where it says, *Hey, call us, and we can chat.  Please*

19 *be advised Graco's prepared to refund your purchase price*, as

20 they did in the formula case -- it's not there.  And I think

21 you overstated it in your brief.

22         **MR. KRASOVEC:**  I can point to the Court the language

23 that I've read.  And that is, in fact, what happens.

24         **THE COURT:**  That's taking that language and roasting

25 it over a bonfire to get to where you want to go.  That's not a

1    fair reading.

2         The test of a reasonable consumer -- you would fail that,

3    because no one would ever read that language and say, *Oh, all I*

4    *have to do is call Graco, and I'll get our money back*.  There's

5    just no way you get to that point from the language you

6    described.

7         Let me ask you one question -- two questions.  Collateral

8    source.  I don't understand.  You seem to be arguing -- Graco

9    seems to be arguing that because the plaintiff had a car

10   accident and got insurance money back, they're somehow --

11        I don't understand what the mootness claim is here.

12             **MR. KRASOVEC:**  The collateral-source rule has no

13   application here.

14             **THE COURT:**  Why doesn't it?

15             **MR. KRASOVEC:**  Because the collateral-source rule

16   applies to the party that caused the accident, and that -- and

17   that they cannot take advantage of an insurance payment.

18        Here, we did not cause that accident.  And the car seat

19   was replaced not because the buckle was bad, but because the

20   plaintiff was in a car accident and got reimbursed for it.

21             **THE COURT:**  Why does that -- how does that possibly

22   meet their claims for fraudulent and deceptive business

23   practices?  The claim in this case is:  You all lied to the

24   consumers.  That's their claim.

25        I'm not saying it's right or wrong.  That's their claim.

1   They had separate from that.  They had some bad luck on the

2   road, and had an auto accident.  And, as I understand that,

3   this is not in evidence, so I'm not making any decisions on

4   this; but as I understand it, whenever there's an accident

5   involving a car seat, a lot of insurance companies just

6   automatically replace the car seat.

7            **MR. KRASOVEC:**  As we recommend.

8            **THE COURT:**  So why and how is it even remotely

9   possible that that rule defeats the plaintiff's standing to

10  bring a false-advertising --

11           **MR. KRASOVEC:**  Because I fail to see how --

12           **THE COURT:**  Hold on.

13     -- or a deceptive-practices claim?

14           **MR. KRASOVEC:**  Because I fail to see how they're

15  damaged in that situation.  They bought a seat.  The car seat's

16  intended purpose is to protect the child.

17           **THE COURT:**  They were damaged because they bought a

18  car seat that, they found out later, didn't provide any of the

19  safety features that were represented.

20           **MR. KRASOVEC:**  But it clearly did, because they were

21  in an accident.

22           **THE COURT:**  That's not a 12(b) motion.  You can't --

23  I mean, that's okay.  Fine.  We've talked a lot.  Go ahead.

24  Mr. --

25           **MR. FRIEDL:**  Mr. Friedl.

1     THE COURT:  I'm sorry.  Mr. Friedl.

2     MR. FRIEDL:  Your Honor has really covered most of

3  the points I wanted to talk about, so I was wondering if the

4  Court had any questions for me.

5     THE COURT:  Well, so Graco claims that your -- is it

6  Mrs. Long or Mr. Long was offered refund?

7     MR. FRIEDL:  They claim that Mrs. Long, not Mr. Long.

8     THE COURT:  Is she a named plaintiff?

9     MR. FRIEDL:  No, she's not.  Mr. Long, himself,

10  didn't have that communication.

11     What we did is we responded in an interrogatory response

12  back in June, or some time ago, that she'd had a conversation

13  with a Graco representative.

14     And the Graco representative -- and this is concerning Car

15  Seat Number Two -- had told her that if she buys another car

16  seat, sends back the car seat she has, and a receipt, and if

17  Graco, who was claiming at that time that the seat wasn't

18  defective, found that their seat was, they would send some --

19  send her some money; either the amount of the receipt, or $149.

20     What Graco --

21     THE COURT:  I don't understand.  There are a lot of

22  details here that I'm having trouble following.  So was -- that

23  was --

24     The refund offered Mrs. Long was for the first car seat?

25  Is that right?

1     MR. FRIEDL:  For the second.

2     THE COURT:  So the first car seat was replaced,

3 pursuant to the insurance.

4     MR. FRIEDL:  Yes.  First car seat.  In the accident.

5 Replaced.

6     She gets a second car seat.

7     THE COURT:  Okay.

8     MR. FRIEDL:  She complains about that, and has a

9 conversation in which Graco claims -- and we've objected to

10 this testimony -- that a conversation occurred between a

11 representative -- I think her name was Wade; and her

12 declaration's not before the Court -- and Mrs. Long, in which

13 Graco contends she was offered a full refund.

14     They were aware from discovery that that was not our

15 position.  We backed it up with a declaration from her in this

16 case.

17     And so in this juncture, for Car Seat Number Two of the

18 three car seats that were purchased, they are not able to

19 establish that the Longs as a married couple, or Mr. Long

20 individually, or Mrs. Long was offered a full refund.

21     THE COURT:  Well, let me ask you this.  So you say --

22 and I have been persuaded, but I want to here more about it,

23 that they never offered -- Graco never offered a full refund?

24     MR. FRIEDL:  Yes.

25     THE COURT:  So your opponent says, *Well, that's not*

1  *entirely true.  You can get the money.*

2      So what is your view of the full-refund issue?

3          MR. FRIEDL:  The full-refund issue is -- for the

4  class members, Your Honor?

5          THE COURT:  For -- yeah, or people in the recall.

6  For anybody --

7          MR. FRIEDL:  It just isn't true, is our position.

8      It really comes down to one document that they contend

9  establishes that there's a full refund.

10     What they've done is -- is they've provided the

11 declaration of Mr. Galampos, who says, *I'm the guy that knows*

12 *about the recall.  And I say that the recall includes a full*

13 *refund.*

14     We scoured all of the documents available on the NHTSA

15 website, available on the Graco website.  I contacted opposing

16 counsel, and asked for whatever documents any public documents

17 that support that statement.  And I've attached to my

18 declaration that exchange.

19     And what it comes down to is one document at Document 105,

20 page 17, where Graco says --

21          THE COURT:  That was Exhibit 3 we looked at?

22          MR. FRIEDL:  Pardon me?  This is in -- this is the

23 Exhibit 3 that counsel was discussing.  It's their Document

24 Number 105, page 17.  And it is part of the important safety

25 recall.  It says on the last page, *Graco previously extended*

1   *the warranty with regard to these buckles.  If, however, you*

2   *have incurred any costs associated with the repairing or*

3   *replacing of the buckles before having received this notice,*

4   *please call* -- and there's an (800) number -- *for information*

5   *about receiving reimbursement.*

6        The only way this paragraph can be read is that if a

7   consumer who purchased this seat incurred any costs -- quote,

8   unquote -- associated with repairing or replacing the buckles,

9   and those costs were incurred before getting the notice, then

10  they will then they can call about receiving reimbursement; and

11  that reimbursement refers to reimbursement for costs.

12       So there is no document, we are convinced, in the public

13  domain.

14            THE COURT:  This would be an easy question.  Where

15  are you all on discovery right now?

16            MR. FRIEDL:  We had some significant discovery before

17  this whole recall issue came up.  We need to do some additional

18  deposition discovery.

19            THE COURT:  Have you deposed Mr. Galampos?

20            MR. FRIEDL:  No.

21            THE COURT:  Okay.  On the injunctive-relief issue, I

22  am skeptical that you've got injunctive-relief claims.

23       Now, just walk me through, so that -- as I understand it,

24  the challenge buckle is not being made.  So there's no

25  possibility of anybody getting the buckle that is accused of

being defective.  So what is the -- what's the imminent harm?

What's the risk of imminent harm or irreparable harm --

imminent risk of irreparable harm that you all are worried

about?

     I mean, asking for corrective advertising?  That's not

going to --

               MR. FRIEDL:  In our Third Amended Complaint we pretty

much abandoned injunctive relief.  What we did was --

               THE COURT:  You can just agree, then, that you're

going to give up any injunctive-relief claims?

               MR. FRIEDL:  Yes.

               THE COURT:  Now let me ask you another question on

the case management.  Where are you all on that?  Jury trial

for --

               MR. KRASOVEC:  Judge Alsup had the case.

Judge Orrick did.  Then the case was transferred to you.  We

did have a CMC, I believe, back in early April.

               THE COURT:  All right.

               MR. KRASOVEC:  And at that time, the recall had come

out.  So plaintiffs were allowed to amend their Complaint to

address that.  And that's what's brought us to this point

procedurally.

               THE COURT:  Okay.  Is there a discovery cutoff coming

up?

               MR. KRASOVEC:  There are no deadlines set right now.

1   I think the Court vacated all of the deadlines, so that we

2   could take up this issue.

3          **MR. FRIEDL:**  That is correct.  All deadlines were

4   vacated, Your Honor.  I think we need a case-management

5   conference to reset them all.

6          **THE COURT:**  All right.

7          **MR. KRASOVEC:**  Your Honor, may I address the standing

8   issue?

9          **THE COURT:**  Sure.  Yeah.

10          **MR. KRASOVEC:**  I don't know that I got to talk about

11   that.

12          **THE COURT:**  That's all we've been talking about

13   standing; whether or not these claims were moot, there's a

14   standing issue.

15          **MR. KRASOVEC:**  Well, I look at it as two separate

16   issues.  I --

17          **THE COURT:**  It is not.  Under the case law there's

18   standing jurisdiction.

19          **MR. KRASOVEC:**  The evidence is -- and even if you

20   take Mrs. Long's affidavit, you know, as the sole proof here.

21   And we are talking about the same car seats; the two

22   My Ride 65s.  There's no contention that she's got a different

23   seat than Mr. Long had.

24       That more than a year or just actually just shy of a

25   year -- a couple of days shy of a year before this lout was

1   filed, she contacted Graco on her own.  And Graco offered her a

2   replacement buckle.  And they said it will be about six weeks

3   to get that.  And she apparently didn't like that.  And so she

4   said, *Well, I want money back*.  And she was told that if she

5   returned the seat -- this is according to her -- and the seat

6   was found to be defective, that she would receive a partial

7   refund.  That's her -- that's her contention.

8       We produced a business record from that conversation.  We

9   didn't even know who Mrs. Long was.  We didn't know her first

10  name, so we didn't know how to find her.

11          **THE COURT:**  I'll look at that.  I know what you're

12  talking about.  Why don't you flip to your copy of that?

13      I also find this to be, at best, a little bit ambivalent.

14  I found it to be a little bit ambivalent.  Remind me which

15  exhibit it is.

16          **THE COURT:**  Oh, yeah.  The order place document.

17  Right?

18          **MR. KRASOVEC:**  This is Exhibit 7.

19          **THE COURT:**  Oh, I mean -- I see a note from someone

20  named Patricia Wade.  And all the note said is, *Refund from*

21  *receipt, or 149.99 no receipt*.

22      I mean, it doesn't say, *I offered consumer refund*.

23      It doesn't say, *Refund will be issued*.

24      It just says -- rather, it's a sentence fragment that

25  you're hanging a lot on, but it doesn't say here --

1        Why wouldn't she just say, *I offered her a refund*?

2            **MR. KRASOVEC:**  This is how the record is kept.

3   Obviously, as you might imagine, a variety of people contact

4   Graco for a variety of reasons.  So there's a standard form

5   that's created in order to capture the information that's

6   discussed between Graco the consumer representative and the

7   consumer.

8        What this note means within this business record, which is

9   what Mr. Galampos explains in his affidavit -- and if we need

10  to, we can get Ms. Ward's affidavit, and she would say the same

11  thing -- is that, in fact, a refund was offered if a receipt

12  was returned and the car seat was returned, or 149.99 if she

13  didn't have a receipt.

14       We now know, Your Honor, several things from the

15  discovery.  One is she did have a receipt, although it was a

16  gift receipt, so it doesn't show the amount.  So we would have

17  to go to Babies-R-Us to find out what the that amount was, but

18  I believe we can do that.  She had that, and she had the seat.

19       Graco sent her -- this document indicates that Graco sent

20  her -- there's actually an outbound loaner tracking number.

21  Graco sends a postage label that's prepaid, and all that.

22            **THE COURT:**  No.  I saw all of that.  Let me just ask

23  you.  What difference does it make?  Why does offering her a

24  pre-suit refund block her Article III standing?

25            **MR. KRASOVEC:**  It moots her standing, because any

1    time, under the case law we've cited, if a consumer is offered

2    a full refund -- because I think we cite the *Vioxx* case for

3    this.   If the consumer is offered a full refund -- the *Abbott*

4    case, maybe.   I'll look at it.   But we cite this in our brief.

5    If they're offered a full refund pre-suit, and they refuse it,

6    which she did, because there's absolutely --

7           **THE COURT:**   She's not the plaintiff.   Mr. Long is the

8    plaintiff.

9           **MR. KRASOVEC:**   But it's the same seat.

10          **THE COURT:**   So what?   She's suing.   She's not the

11   plaintiff.   She was offered the refund.   I don't know what

12   their marital status is, and I don't know whether they live

13   together.   I don't know whether they have separate cars.   I

14   mean, who knows?   She's not the plaintiff.

15       Now, you may -- the case law was all about people who

16   might be the actual plaintiff getting a refund.

17       Now, I don't see that.   There's nothing about a friend or

18   a housemate or a spouse of the plaintiff, and gets an offer --

19          **MR. KRASOVEC:**   There's no contention it's a different

20   seat.   And we only learned --

21          **THE COURT:**   Yeah, but even if that's true, that's

22   just a substitution of a named plaintiff.   Right?   I mean, the

23   ultimate remedy here is:   They need to find somebody who's a

24   different class rep.   And maybe this is a class issue, a

25   certification issue, an adequacy issue; not a standing issue.

1        **MR. KRASOVEC:**  Well, it's a standing issue, I

2  believe, Your Honor, because for the seat that's at issue in

3  this case -- the very seat that's at issue in this case -- a

4  full refund was offered, pursuant to Graco's records.  And --

5        **THE COURT:**  Well, they dispute that.

6        **MR. KRASOVEC:**  And nobody -- neither -- Mr. Long

7  didn't say, *Okay*.  *Let's take the offer*.  There was no response

8  to our postage, to extending the postage, nor was there any

9  further follow-up.  In essence, the refund offer was refused on

10  the seat that's at issue in this litigation.

11        **THE COURT:**  Okay.  Mr. Friedl, very briefly.  Then

12  we're going to wrap up.

13        **MR. FRIEDL:**  Mrs. Long's declaration speaks for

14  itself.  She said that if they found it defective, which is a

15  big "if," she'd get a check back, and she'd still like to buy

16  another seat.  So there's clearly no --

17      And this is only one of three seats.  They bought a third

18  seat.  We could amend to add a third seat, if the standing

19  issue was a real issue; but I really don't believe it is,

20  respectfully, Your Honor.

21        **THE COURT:**  Okay.  Let me talk about case management.

22  I will issue an Order soon.  There are a couple things I want

23  to think about.  I'm not going to give you a preview yet.  I

24  want you to keep the train rolling.  You're almost done.  I

25  know there are no deadlines.  As a practical matter, is

1     discovery almost done?

2          **MR. FRIEDL:**  Well, we haven't been conducting

3     discovery in the period of time -- which has been quite a

4     while; since February or March -- that this issue has been

5     going on.  So we need to restart discovery.  But I think

6     we're -- we could be on -- in line for a motion for class

7     certification over the next year.

8          **THE COURT:**  First quarter of next year?

9          **MR. FRIEDL:**  Yes.

10        **THE COURT:**  And trial setting in June, or something

11     like that?

12        **MR. KRASOVEC:**  That may be a little aggressive.

13     Maybe the third quarter of 2015.

14        **MR. FRIEDL:**  I'd agree.

15        **THE COURT:**  Okay.  Okay.  Thank you.

16        **MR. FRIEDL:**  Thank you.

17        **MR. KRASOVEC:**  Thank you, Your Honor.

18     (At 10:28 a.m. the proceedings were adjourned.)

19    I certify that the foregoing is a correct transcript from the

20    record of proceedings in the above-entitled matter.

21

22    *Lydia Zinn*

23    _____  August 4, 2016

      Signature of Court Reporter/Transcriber     Date

24    Lydia Zinn

25